SNAP–ON TOOLS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 279–84T.

United States Claims Court.

Aug. 13, 1992.

James L. Malone, III, Chicago, Ill., for plaintiff.

Charles Bricken, and Kenneth C. Gobetz, Tax Div., Dept. of Justice, Washington,

D.C., with whom was Asst. Atty. Gen., for defendant.

## OPINION

HORN, Judge.

### BACKGROUND

This case is before the court on the motion for summary judgment filed by Snap–On Tools, Inc., the plaintiff, and on the defendant's cross-motion for summary judgment.[1] The instant litigation commenced by the filing of a lengthy complaint, including some 51 paragraphs in which multiple, separate claims were combined in the five counts, with each count representing a different tax year. The case was originally assigned to Judge Wood, and upon his retirement re-assigned to this judge. The litigation was suspended pending negotiation of the British and American Competent Authority representatives.

Over the course of the instant litigation, Counts 1, 2, 3, and parts of Counts 4 and 5 have been dismissed by stipulation, and the "worker's compensation" issue, included in Count 4, has been settled. At oral argument on the cross-motions for summary judgment, when informed for the first time that the second audit issue had been dropped, the court requested the parties to give formal notice of those issues which no longer required judicial resolution. In response, the parties stipulated:

> to dismiss the issue referred to in paragraphs 12, 23, and 34 of plaintiff's Complaint in this case, filed on or about May 19, 1984. Specifically, the issue referred to is the so-called "second audit" issue

referred to in the indented portions of paragraphs 12, 23 and 34.[2]

Subsequently, the parties stipulated that the claims for relief set forth in paragraphs 42 through 44 and 49 through 51 of the complaint, relating to the "workmen's compensation" deduction, be dismissed.[3]

At status conferences and the oral argument, the parties have referred consistently to the 1979 tax year, and stated that 1979 was the only year at issue. Moreover, the only issue briefed in the cross motions for summary judgment, and argued by the parties to the court, is regarding the reconcilability of the 60–day rule included in section 902(c)(1) of the Internal Revenue Code of 1954 (IRC)[4] 26 U.S.C. § 902(c)(1), and the provisions of the United States–United Kingdom Income Tax Convention.[5] Upon review of the complaint, and the pleadings, however, the court determined that the stipulations and dismissals previously filed do not appear to fully dispose of certain allegations included in the complaint in addition to the 1979 tax year, because claims raised in the complaint for the 1981 tax year also remained to be resolved.

On July 23, 1992, in a joint telephone conversation, initiated by the court, the parties agreed that the second audit issue had not been dropped from Count 5, which relates to the 1981 tax year, and that the 1981 year remained open with respect to any re-adjustment of foreign tax credit carry-forward. Although aspects of the 1981 tax year remain at issue, because the cross-motions filed by plaintiff and defendant address the 1979 tax year, that year will be used in this Opinion as the example to

---

1. This court's jurisdiction was invoked pursuant to 28 U.S.C. section 1346(a)(1) and is uncontested.

2. Paragraphs 12, 23, and 34 relate to the plaintiff's 1975, 1976, and 1977 tax years, respectively.

3. Paragraphs 42 through 44 and 49 through 51 relate to the plaintiff's 1979 and 1981 tax years, respectively.

4. All references to the Internal Revenue Code (IRC) are to the Internal Revenue Code of 1954,

as amended, and in effect during the tax year at issue, 1979.

5. Convention Between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, December 31, 1975, 31 U.S.T. 5668 (entered into force April 25, 1980). (United States–United Kingdom Income Tax Convention).

decide the legal issues at stake for both the 1979 and 1981 tax years.

Snap-on Tools, Inc., the plaintiff, is a United States corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Kenosha, Wisconsin. The plaintiff is in the business of manufacturing and selling cutlery, hand tools, and general hardware. Snap-on Tools, Ltd., is a wholly-owned foreign subsidiary of the plaintiff, Snap-on Tools, Inc. and is a resident corporation of the United Kingdom, with its principal offices in Kettering, England. The plaintiff timely filed its United States Corporation Income Tax Return with the United States for the 1979 tax year. The plaintiff reported tax liability of $23,624,143.00 on its original return, and paid all amounts due to the United States on June 13, 1980.

On its original and amended 1979 United States tax returns, the plaintiff claimed a foreign tax credit under IRC section 902 for United Kingdom taxes paid by its foreign subsidiary, Snap-on Tools, Ltd. IRC section 902 provides the United States parent corporation of a foreign subsidiary with an "indirect" or "deemed paid" credit on its United States income tax return for foreign taxes paid by a subsidiary. The credit protects domestic corporations operating through foreign subsidiaries from double taxation on the same income, i.e., taxation first by the foreign jurisdiction, when the income is earned by the subsidiary, and second by the United States, when the income is received as a dividend by the parent corporation. IRC section 902 limits the United States parent corporation's credit to the amount of tax paid by the subsidiary that is attributable to the dividend actually issued. The foreign tax credit is calculated

**6.** The United Kingdom tax system differs substantially from the system of separate corporate and individual taxation used in the United States, under which dividends received by shareholders are generally taxed without regard to the taxes paid by the distributing corporation.

**7.** For the years at issue in the complaint, as filed, the ACT rate ranged from 30/70 to 35/65 percent of the distribution.

pursuant to the instructions included in IRC sections 901 and 902.

In 1973, the United Kingdom implemented a new system of corporate taxation which partially integrated its corporate and individual income tax systems.[6] Under this system, a United Kingdom Advance Corporation Tax (ACT) is levied on a United Kingdom corporation when it pays a dividend to its shareholders.[7] The ACT is an advance payment in partial satisfaction of the corporation's regular United Kingdom corporate income tax.[8] A United Kingdom corporation pays corporate income tax at a flat rate on its United Kingdom taxable income. This income tax is known as the "mainstream tax." The ACT may be used to offset a portion of the distributing corporation's United Kingdom mainstream tax for the year in which the dividend is paid.[9] On February 27, 1979, Snap-on Tools, Ltd., paid the plaintiff a dividend of £600,000.00, within the first 60 days of the taxable year, and paid Inland Revenue, the United Kingdom tax authority, ACT of £295,522.38 on that amount. On December 19, 1979, Snap-on Tools, Ltd. paid plaintiff a dividend of £480,000.00 and paid ACT thereon of £205,714.00.

In the United Kingdom, ACT is generally credited against the distributing corporation's United Kingdom mainstream tax. At the shareholder level, the ACT paid by the distributing corporation is allowed as a credit against a United Kingdom resident individual shareholder's United Kingdom income tax liability, or refunded in cash to the extent the ACT credit exceeds the shareholder's income tax liability. An individual shareholder in the United Kingdom must include as part of taxable income the sum of the ACT credited and the dividend received.

**8.** The United Kingdom corporate income tax rate was 52 percent for the tax year at issue, 1979.

**9.** Under United Kingdom tax rules, the maximum amount of ACT which can be credited against mainstream United Kingdom corporate income tax is 35/52 percent of corporate income tax. Any excess ACT may be carried back two years, and carried forward indefinitely to offset the mainstream tax.

The credit or refund of any ACT, however, is not available to a shareholder who is not a United Kingdom resident, absent a specific provision in a treaty between the United Kingdom and the shareholder's country of residence. Because the 1945 United States–United Kingdom Income Tax Convention [10] lacked such a provision, United States shareholders of United Kingdom corporations were unable to take advantage of the credit or receive a refund of United Kingdom ACT. The United States and United Kingdom, therefore, negotiated a new income tax convention after the United Kingdom instituted its new system of corporate taxation in 1973.

The United States–United Kingdom Income Tax Convention was signed on December 31, 1975. Instruments of ratification were exchanged on March 25, 1980. According to paragraph 2 of Article 28 (Entry into Force) of the Income Tax Convention, the Convention was to be effective after expiration of 30 days following the exchange of the instruments of ratification, and thus, became effective on April 25, 1980. Article 28 (Entry into Force) also states that the provisions dealing with the credit or refund of the ACT will apply retroactively to tax years beginning on or after April 6, 1975.

The United States–United Kingdom Income Tax Convention entitles a United States corporation owning 10 percent or more of the voting stock of a resident United Kingdom corporation, and which also pays a dividend to the United States corporation, to a payment from the United Kingdom of a tax credit equal to one-half of the tax credit to which an individual resident in the United Kingdom would have been entitled, had the individual resident received the dividend, less a withholding tax of not more than 5 percent.[11]

As a result of the entry into effect of the United States–United Kingdom Income Tax Convention, the plaintiff undertook certain accounting adjustments in the computation of its United States foreign tax credit. On April 30, 1980, the plaintiff's United Kingdom subsidiary, Snap-on Tools, Ltd., filed a claim with Britain's Inland Revenue Office, for a refund of one-half of the ACT that it had paid with respect to the February 27, 1979 (£600,000.00) and December 19, 1979 (£480,000.00) dividends. On or about December 4, 1980, the plaintiff filed a first amended 1979 United States Corporation Income Tax Return with the United States

**10.** The previous iteration of this treaty was titled "Convention Between the United Kingdom of Great Britain and Northern Ireland and the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income," and was signed on April 16, 1945.

**11.** The relevant provision of the United States–United Kingdom Income Tax Convention is as follows:

*Article 10—Dividends*

(2)(a) In the case of dividends paid by a corporation which is a resident of the United Kingdom:

(i) to a United States corporation which either alone or together with one or more associated corporations controls, directly or indirectly, at least 10 percent of the voting stock of the corporation which is a resident of the United Kingdom paying the dividend, the United States corporation shall be entitled to a payment from the United Kingdom of a tax credit equal to one-half of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 5 percent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such corporation;

(ii) in all other cases, the resident of the United States to whom such dividend is paid shall be entitled to a payment from the United Kingdom of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 15 percent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such resident;

(iii) the aggregate of the amount or value of the dividend and the amount of the tax credit referred to in sub-paragraphs (a)(i) and (ii) of this paragraph paid by the United Kingdom to the United States corporation or other resident (without reduction for the 5 or 15 per cent deduction, as the case may be, by the United Kingdom) shall be treated as a dividend for United States tax credit purposes. United States–United Kingdom Income Tax Convention, April 25, 1980, Art. 10(2)(a).

Internal Revenue Service (IRS), in accordance with Revenue Procedure 80–18, 1980–1 C.B. 623.[12] Revenue Procedure 80–18 sets forth procedures for taxpayers to follow in applying certain of the provisions of the United States–United Kingdom Income Tax Convention. To calculate the amount of deemed paid credit, the plaintiff was required to establish out of which year(s) profits Snap-on Tools, Ltd., paid the dividends at issue. The plaintiff determined that Snap-on Tools, Ltd., paid the February 27, 1979 dividend out of the 1978 profits of Snap-on Tools, Ltd., but treated the dividend paid on December 19, 1979 as distributed from its 1979 profits. The plaintiff asserts that under IRC section 902(c)(1), it is entitled to treat dividends paid in the first 60 days of any year (in this case February 27, 1979) as having been paid from profits of the preceding year (in this case 1978).

The IRS audited the plaintiff's first amended 1979 United States Corporation Income Tax Return, and treated both dividends as having been paid out of the 1979 profits of Snap-on Tools, Ltd. The IRS alleges that under the United States–United Kingdom Income Tax Convention, a distribution in respect of which the ACT paid reduces the United Kingdom mainstream tax for the current year should be treated by the IRS as paid out of the accumulated profits of that year, regardless of whether the distribution is made within the first 60 days of the taxable year. In the alternative, the IRS argues that IRC section 902(c)(1) confers upon the Secretary of the Treasury (the Secretary) discretion to determine to which year's profits dividends paid during the first 60 days of the taxable year of distribution should be attributed. The decision of the IRS to "source" the February 27, 1979 dividend paid by Snap-on Tools, Ltd., to their 1979 profits, reduced the plaintiff's 1979 foreign tax credit for dividends paid by its United Kingdom subsidiary from $1,700,477.00, as reported on the plaintiff's amended 1979 United States income tax return, to $890,191.00. Thereby

the plaintiff's 1979 income tax liability was increased by $810,286.00.

The plaintiff filed a second amended return and paid the additional taxes assessed by the IRS and subsequently filed a claim for a refund. After the IRS failed to act on the plaintiff's refund claim within the six-month period established by section 6532 of the IRC, 26 U.S.C. § 6532 (1988), the plaintiff filed this refund action in the United States Claims Court to recover from the United States an alleged overpayment of $810,286.00 of federal income taxes for the 1979 tax year.

The issues currently before the court, therefore, are whether the United States–United Kingdom Income Tax Convention bars the plaintiff from applying IRC section 902(c)(1), in such a manner as to treat the dividend paid on February 27, 1979, by Snap-on Tools, Ltd., as having been paid out of the 1978 profits of Snap-on Tools, Ltd. At issue also is whether, under IRC section 902(c)(1), the Secretary of the Treasury had and/or exercised properly, the discretion to refuse to apply the 60–day rule. After careful consideration of the briefs filed by the parties, the oral argument held on the cross-motions for summary judgment, consideration of the numerous other materials filed by the parties, and for the reasons discussed below, the court, hereby, GRANTS the plaintiff's motion for summary judgment. The defendant's cross-motion for summary judgment is, therefore, DENIED.

## DISCUSSION

■ Summary judgment in the United States Claims Court is properly granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Claims Court (RUSCC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar in language and effect.[13] Both Rules provide that sum-

---

**12.** Rev.Proc. 80–18, 1980–1 C.B. 623, was amplified and clarified by Rev.Proc. 81–58, 1981–2

C.B. 678, and Rev.Proc. 84–60, 1984–2 C.B. 504, and Rev.Proc. 90–61, 1990–2 C.B. 657.

**13.** In general, the Rules of the United States

mary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c); Fed.R.Civ.P. 56(c). Rule 56(c) of the Rules of the United States Claims Court provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of showing that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Ass'n, Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991).

 Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

 When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must

prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538. If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. As indicated above, any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Industrial Products, Inc. v. Solid State Systems Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

 In *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court added an additional provision to the long standing summary judgment guidelines outlined above when it indicated that the initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged, if the moving party can show, alternatively, that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2554; *see also Lima Surgical Assoc.,* 20 Cl.Ct. at 679. If the moving party makes this showing, the burden is placed on the nonmoving party to show that a genuine factual dispute exists by presenting evidence establishing the existence of an element of its case upon which it bears the burden of proof. *Lima Surgical Assoc.,* 20 Cl.Ct. at 679. The logic behind this addition is simple. If, under no scenario, can the nonmoving party present the evidence necessary to support its case, then there should be no genu-

---

Claims Court (RUSCC) are closely patterned upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Fed. R.Civ.P. is relevant to interpreting the RUSCC,

including RUSCC 56(c). *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

ine need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Under Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories and admissions, in order to show that a genuine issue for trial exists. *Celotex v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. The type of evidence provided by the party opposing summary judgment need not meet the standards for admissibility at trial.

 The fact that both parties have moved for partial or full summary judgment, based on the alleged absence of genuine issues of material fact, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "Simply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969). *See also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

In the instant case, both parties agree that there are no genuine issues of material fact to preclude summary judgment, and the court agrees. The only issues to be determined by the court concern the applicability of IRC section 902(c)(1) to the dividends in question, following the effective date of the United States–United Kingdom Income Tax Convention, and whether the Secretary of the Treasury had discretion to deny the plaintiff's choice to apply the 60–day rule to these dividends.

According to the stipulation of the parties, on or about December 4, 1980, the plaintiff filed an amended United States Corporation Income Tax Return for the 1979 tax year. The amended return was filed:

> to reflect the impact of the U.S.–U.K. Income Tax Treaty as required pursuant to Revenue Procedure 80–18 and to report pursuant to section 905 of the Internal Revenue Code the effect of an overestimation of 1979 United Kingdom Corporation Tax. Foreign Tax Credit carry-forwards to 1979 as of the time of filing have also been revised pursuant to Revenue Procedure 80–18.

The IRS audited the amended return, and assessed additional taxes. The plaintiff then filed a second amended return. The plaintiff made a timely payment of the additional taxes due and brought this action. The Revenue Agent's Report, dated March 29, 1983, recomputed the plaintiff's foreign tax credits, sourcing the February 27, 1979 dividend paid by Snap-on Tools, Ltd., from its 1978 to its 1979 accumulated profits. According to the Revenue Agent's Report:

> In most cases dividends paid within 60 days of the end of the fiscal year of the foreign subsidiary are sourced from that subsidiary's earnings and profits from the prior year. The authority for this determination is found in IRC § 902(c)(1)....

> An exception to this general rule is made when a recomputation of the deemed paid credit is required due to a refund of Advance Corporation Tax from

the United Kingdom. The authority for this exception is found in Revenue Procedure 80–18 and the Technical Explanation to the U.S.–U.K. Income Tax Convention submitted to the Senate Foreign Relations 'Committee....

In conclusion, since the ACT paid on the February '79 dividend was used as an offset of the 1979 mainstream tax, the dividend must be sourced from the 1979 earnings and profits, regardless of the 60–day rule.

As stipulated by the parties, on or about September 15, 1983, the plaintiff filed another amended tax return to claim a refund for overpayment of taxes arguing that, pursuant to IRC section 902(c)(1), the February 27, 1979 dividend should be sourced to the 1978 tax year rather than to the 1979 tax year.

 In a tax refund case, there is a strong presumption of the correctness of the findings of the Commissioner of the Internal Revenue. The taxpayer has the burden of rebutting that presumption and of establishing entitlement to a specific amount of a credit claimed. *United States v. Janis,* 428 U.S. 433, 440–41, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir.1990); *L.W. Hardy Co. v. United States,* 1 Cl.Ct. 465, 470 (1982); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969). In order to overcome this presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–52, 510 F.2d 1365, 1369 (1975) (citing *Comm'r v. Riss,* 374 F.2d 161 (8th Cir.1967)). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. A plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *Danville Plywood Corp.,* 899 F.2d at 7–8; *Transamerica Corp. v. United States,* 902 F.2d

1540, 1543 (Fed.Cir.1990). But, even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *Id.* Therefore, in the instant case, the plaintiff must persuade the court that the IRS erred in its interpretation of the effect of IRC section 902(c)(1), on taxes creditable under the United States–United Kingdom Income Tax Convention.

 Although there is a strong presumption of the correctness of the findings of the IRS Commissioner, where there is a reasonable doubt as to the meaning of a taxing statute, it should be construed in the light most favorable to the taxpayer. *Gould v. Gould,* 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917). " 'Tax laws, like all other laws, are made to be obeyed. They should therefore be intelligible to those who are expected to obey them.' " *White v. Aronson,* 302 U.S. 16, 20–21, 58 S.Ct. 95, 97, 82 L.Ed. 20 (1937) (quoting *Philadelphia Storage Battery Co. v. Lederer,* 21 F.2d 320, 321–22 (E.D.Pa.1927)). Furthermore, when a principle of tax law requires re-examination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. *Hardee v. United States,* 708 F.2d 661, 664 (Fed.Cir.1983) (citing *United States v. Byrum,* 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972)).

Section 902 of the IRC, as in effect for the 1979 tax year, provides a United States parent corporation of a foreign subsidiary with an income tax credit for the foreign taxes paid by its subsidiary. The parties, however, disagree on the interpretation of the applicable rules for this tax credit, and also disagree as to the application of IRC section 902(c)(1) in combination with the United States–United Kingdom Income Tax Convention. The pertinent provisions of IRC section 902 are set forth below:

§ 902. Credit for corporate stockholder in foreign corporation

(a) Treatment of taxes paid by foreign corporation.—*For purposes of this subpart, a domestic corporation which owns at least 10 percent of the voting stock of a foreign corporation from*

*which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war profits, or excess profits taxes paid or deemed to be paid by such foreign corporation* to any foreign country or to any possession of the United States, on or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends (determined without regard to section 78) bears to the amount of such accumulated profits in excess of such income, war profits, and excess profits (other than those deemed paid).

(c) Applicable Rules

(1) Accumulated profits defined.—For purposes of this section, the term "accumulated profits" means, with respect to any foreign corporation, the amount of its gains, profits, or income computed without reduction by the amount of the income, war profits, and excess profits taxes imposed on or with respect to such profits or income by any foreign country or by any possession of the United States. *The Secretary shall have full power to determine from the accumulated profits of what year or years such dividends were paid, treating dividends paid in the first 60 days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise),* and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings.

IRC section 902(a), (c)(1) (1976) (emphasis added).

This court observes that the 60–day rule included in IRC section 902(c)(1) stood almost without change for over forty years and was part of the law of the United States when the United States–United Kingdom Income Tax Convention was negotiated and signed in 1975. In fact, the 60–day rule was part of the IRC from 1921 [14] until it was repealed by the Tax Reform Act of 1986, Pub.L. No. 99–514,

§ 1202(a), 100 Stat. 2085, 2529, effective for tax years beginning after December 31, 1986.

■■■ A source of conflict between the parties has been the interpretation of the underscored language in IRC section 902(c)(1), commonly referred to as the "60–day rule." The plaintiff argues that if the first underscored clause of IRC section 902(c)(1), granting the Secretary of the Treasury "full power to determine," was meant to give the Secretary absolute discretion, the second clause would be rendered meaningless. According to the plaintiff, the second clause limits the Secretary's "full power to determine," because the use of the imperative clause, "treating dividends paid in the first 60 days of any year" commands him to source dividends paid in the first 60 days of the year to the profits of the preceding year or years. The plaintiff, therefore, argues that the 60–day rule is a "rebuttable presumption," under which the Secretary should apply the 60–day rule, "unless shown otherwise to his satisfaction."

The plaintiff maintains that the 60–day rule should be applied in the instant case. According to the plaintiff, if the 60–day rule is not to be followed in a particular case, the taxpayer, not the Secretary or his delegate, is the party which must affirmatively convince the decisionmaker not to apply the rule. The plaintiff cites to a tax court case, *H.H. Robertson Co. v. Commissioner,* 59 T.C. 53 (1972), *aff'd,* 500 F.2d 1399 (3d Cir.1974) (unpublished order), to show that from time to time, prior to the publication of the Technical Explanation of the United States–United Kingdom Income Tax Convention, discussed below, the IRS applied the 60–day rule in the manner plaintiff suggests. According to the language of *Robertson:*

> the Petitioner itself (on its return for 1965) treated the $3,366,658 cash dividend as having been paid from the accumulated profits of years prior to 1965. Since that dividend was paid within the first 60 days of 1965, the Commissioner was empowered under section 902(c)(1) to

---

**14.** Revenue Act of 1921, Ch. 136 § 238(e), 67th Cong., 1st Sess., 47 Stat. 227 (1921).

treat it 'as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise).' And petitioner has made no contention that this dividend should not be attributed to the 'accumulated profits' of prior years.

*Robertson,* 59 T.C. at 80.

The defendant, however, disputes the plaintiff's contention that the taxpayer, and not the Secretary of the Treasury, determines whether the 60–day rule is to be applied. Under the defendant's interpretation of the statute, if the Secretary is convinced that a dividend paid in the first 60 days of any year is more properly attributable to the accumulated profits of the year of payment than to those of the previous year, the Secretary has the "discretion" to attribute the dividend to the year of payment. The defendant rejects the plaintiff's interpretation, and alleges that the plaintiff's approach would allow the Secretary no discretion to hold the 60–day rule inapplicable, even when the Secretary learned of facts which would lead him to believe that the 60–day rule should not apply.

■■■ "The starting point in every case involving construction of a statute is the language itself." *Bread Political Action Comm. v. Federal Election Comm'n.,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982); *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051–2056, 64 L.Ed.2d 766 (1980); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1974), *reh'g denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975); *see also Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, and common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (citing *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184–85, 43 L.Ed.2d 469 (1975)). " 'The

legislature must be presumed to use words in their known and ordinary signification.' " *Old Colony R.R. v. Commissioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932) (quoting *Levy's Lessee v. McCartee,* 31 U.S. (6 Pet.) 47, 49, 8 L.Ed. 334 (1832)). The court may not substitute its judgment for that of Congress as to the best means for achieving a purpose. *Greenville Steel Car Co. v. United States,* 222 Ct.Cl. 400, 405, 615 F.2d 911, 914 (1980); *see also United States v. Calamaro,* 354 U.S. 351, 357, 77 S.Ct. 1138, 1142, 1 L.Ed.2d 1394 (1957).

■■■ The constitutionally mandated role of a court is to interpret the laws, as evidenced by the statutory language, rather than to reconstruct legislative intentions. Where the language of a statute is clear, the courts should not replace that language with unenacted legislative intent. *See INS v. Cardozo–Fonseca,* 480 U.S. 421, 452–53, 107 S.Ct. 1207, 1224, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring);[15] *Foreman v. United States,* 26 Cl.Ct. 553, 563 (1992). When a statute evidently was drawn with care, and its language is plain and unambiguous, a court cannot supply omissions, for that would be:

> "not a construction of a statute but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function."

*Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926).

■■■ " '[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " *Lynch v. Alworth–Stephens Co.,* 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660 (1925) (quoting *Lynch v. Alworth–Stephens Co.,* 294 Fed. 190, 194 (8th Cir.1923)); *see also Old Colony R.R. v. Commissioner,* 284 U.S. at 560, 52 S.Ct. at

---

**15.** *See also* Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 419 (1899) ("We do not inquire what the legislature meant; we ask only what the statute means.").

213. A statute also should be interpreted so as to give meaning to all its language. As the Supreme Court has stated: " 'In construing a statute we are obliged to give effect, if possible, to every word Congress used.' " *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) (quoting *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955)).

Treasury Regulation section 1.902–1 was issued to implement IRC section 902. Of particular relevance in the instant case is Treasury Regulation section 1.902–1(g)(4), which reads as follows:

"The district director in whose district is filed the income tax return of the domestic shareholder claiming a credit under section 901 for foreign income taxes deemed, under section 902 and this section, to be paid by such shareholder shall have the power to determine, with respect to a foreign corporation, from the accumulated profits of what taxable year or years the dividends were paid. In making such determination the *district director shall, unless it is otherwise established to his satisfaction, treat any dividends which are paid in the first 60 days of any taxable year of such a corporation as having been paid from the accumulated profits of the preceding taxable year* or years of such corporation and shall, in other respects, treat any dividends as having been paid from the most recently accumulated profits."

Treas.Reg. § 1.902–1(g)(4) (1979) (emphasis added). Presumably, the Treasury Department wrote the regulatory language with deliberation, intending to be consistent with the statutory language, pursuant to which the regulation was issued. In fact, the regulatory language regarding how to treat dividends paid in the first 60–days of any taxable year is very similar to the statutory language.

■ "Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code." *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19

L.Ed.2d 537 (1967) (quoting 26 U.S.C. § 7805(a)); *see also United States v. Moore,* 95 U.S. 760, 763, 24 L.Ed. 588 (1878). According to *National Muffler Dealers Association v. United States:*

that delegation helps ensure that in 'this area of limitless factual variations,' *ibid.* [*United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967) ] like cases will be treated alike. It also helps guarantee that the rules will be written by 'masters of the subject,' *United States v. Moore,* 95 U.S. 760, 763 [24 L.Ed. 588] (1878), who will be responsible for putting the rules into effect.

*National Mufflers Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1978). A Treasury Regulation, "if properly found to 'implement the congressional mandate in some reasonable manner,' must be upheld." *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1978) (quoting *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967)).

The Treasury Regulation, by the use of the imperative verb "shall ... treat," seems to confirm the plaintiff's contention that the Secretary is without discretion to treat dividends paid in the first 60 days of any year as having been distributed from other than the previous year's accumulated profits, *unless* an affirmative showing otherwise is made to the District Director's satisfaction. Treasury Regulation section 1.902–1(g)(4), appears to be a reasonable and consistent interpretation of the statutory words of IRC section 902(c)(1) and does not alter or amplify the statutory imperative which requires the Secretary to treat dividends paid in the first 60 days of any year as paid from the profits of the preceding year or years, absent a contrary showing to the Secretary's, or to his delegate's satisfaction. Moreover, the Treasury Regulation appears to be a proper delegation to the District Director of the Secretary's "full power" to determine the year or years to which a dividend is to be sourced, as well as a clear direction that the District Director also shall follow the 60–day rule.

The sequence of issuances by the United States Department of the Treasury, regarding IRC section 902(c)(1), combined with the positions taken by the defendant in this case, is internally inconsistent. The plaintiff cites to IRS National Office Technical Advice Memorandum 760614, in which the IRS ruled:

> It is our view that section 902(c) of the Code and the regulations thereunder mandate treating dividends paid in the first 60 days of any year as having been paid from accumulated profits of the preceding year or years unless the *taxpayer* demonstrates otherwise to the satisfaction of the District Director. Such view results from our statutory interpretation of section 902(c) and its predecessors as well as the Service's position in *Robertson, supra.* * * *
> Consequently, you are correct in stating that on occasion it is necessary to treat dividends paid within the first 60 days of any taxable year as attributable to current earning and profits. However, such rule is limited to situations where sufficient previous years' earnings and profits ... are not available for distribution....

Tech.Adv.Mem. 760614 (June 14, 1976) (emphasis in original).

In its motion for summary judgment, the defendant argues that Internal Revenue Service General Counsel Memorandum 39,-471 (Jan. 7, 1986), overrules "generally" the earlier Technical Advice Memorandum 760614. During discovery in the instant case, in response to interrogatories submitted by the plaintiff, the defendant also had stated its intention to rely upon General Counsel Memorandum 39,139 (March 1, 1984). The defendant, however, does not address this memorandum in subsequent pleadings. General Counsel Memorandum 39,139, which preceded General Counsel Memorandum 39,471, took the position that:

> With respect to dividend distributions on which the United Kingdom imposes ACT liability, we believe that the Service, in accordance with the provisions of the Treasury Technical Explanation to the Convention, 1980–1 C.B. 455, 472–473, *may* disregard the 60–day rule set forth

in section 902(c)(1) of the Code, in determining from what year's accumulated profits a dividend was paid. This disregard of the 60–day rule *is necessary* to ensure that dividend distributions, which trigger ACT liability, will be treated as paid out of the accumulated profits of the year or years in which the distributing corporation's payments in satisfaction of that ACT liability are treated under United Kingdom tax law as offsetting its United Kingdom mainstream corporation tax liability.

> \* \* \* \* \* \*

> Notwithstanding this literal or technical argument, we believe that the *flexible* 60–day rule position set forth in the Treasury Technical Explanation is a reasonable, sound, and necessary corollary to the comprehensive interpretation in the Technical Explanation and Rev.Proc. 80–18 of the ACT refund—tax credit mechanism provided by Articles 10 and 23 of the Convention and of the deemed paid tax credit rules under section 902 of the Code. Thus, we believe such interpretation should be followed in order to achieve the Convention's purpose of securing the benefit of U.K. ACT refunds and U.S. tax credits for U.S. corporate shareholders with respect to the ACT paid by the dividending U.K. corporation.

Gen.Couns.Mem. 39,139 (emphasis added). This memorandum sets out several conflicting directions: that the 60–day rule "may" be disregarded, that disregard of the 60–day rule "is necessary" and that there should be a "flexible 60–day rule."

Next, General Counsel Memorandum 39,-471, addresses a case in which a dividend was issued *after* the first 60 days of the taxable year. Although some of the language in General Counsel Memorandum 39,471 seems to support broad discretion to the Secretary, the holding in the memorandum addresses a case in which the 60–day rule was not in issue. Therefore, the plaintiff's position is not inconsistent with the position adopted by the IRS in General Counsel Memorandum 39,471. General Counsel Memorandum 39,471 states:

We agree with the taxpayer's interpretation of the second sentence in section 902(c)(1)—namely, that such sentence requires that the 1978 and 1979 dividends be treated by the Service as having been made from the subsidiary's 1978 and 1979 accumulated profits. The first clause in section 902(c)(1) (second sentence) states that the Secretary should have 'full power' to determine from what year or years' accumulated profits a dividend is paid. This seemingly broad grant of discretion, however, is followed by the second clause, 'treating dividends paid in the first 60 days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise).' (Emphasis added). The second clause (including the parenthetical language at the end) is separated by commas from the first ('full power') clause and the third clause—'and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings.' (Emphasis added).

Although the 'full power' clause of section 902(c)(1) (second sentence) could be interpreted to give the Secretary absolute discretion to determine from what year or years' accumulated profits a dividend is paid, such interpretation would render the second and third clauses of the sentence meaningless. We think the second sentence in section 902(c)(1) should be construed as a whole, so as to give full effect to the language in, and arrangement of, the clauses therein.

Thus, we interpret section 902(c)(1) (second sentence) to provide that if a foreign corporation pays a dividend to a domestic shareholder within the first 60 days of the foreign corporation's taxable year, such dividend, generally, is to be treated as paid from the distributing corporation's accumulated profits of the preceding year or years (60–day rule). Pursuant to the parenthetical language at the end of the second clause, however, the Secretary has full power, *given sufficient proof,* to depart from the 60–day rule, and to treat a dividend distributed by a foreign corporation within the first 60 days of its taxable year as paid from such corporation's accumulated profits of the year such dividend is distributed. However, in 'other respects,' that is, dividends paid after the first 60 days of any year, the Secretary does not have the same discretion.

Gen.Couns.Mem. 39,471 (emphasis added).

The court also notes that the Technical Advice and General Counsel Memoranda, cited by both the defendant and the plaintiff, have no binding precedential force on this court, although they are admissible as evidence of the Internal Revenue Service's administrative practice. Similarly, Private Letter Rulings, although evidence of the Commissioner's administrative practice on a particular issue are not binding authority. *Rowan Cos. v. United States,* 452 U.S. at 261, 101 S.Ct. at 2296. As stated by the Supreme Court, "departmental rulings not promulgated by the Secretary are of little aid in interpreting a tax statute." *Biddle v. Commissioner,* 302 U.S. 573, 582, 58 S.Ct. 379, 383, 82 L.Ed. 431 (1938) (citing *Helvering v. N.Y. Trust Co.,* 292 U.S. 455, 467–68, 54 S.Ct. 806, 810, 78 L.Ed. 1361 (1934)); *see also Rowan Cos. v. United States* 452 U.S. 247, 261 n. 17, 101 S.Ct. 2288, 2296 n. 17, 68 L.Ed.2d 814 (1981); *Niles v. United States,* 710 F.2d 1391, 1394 n. 4 (9th Cir.1983); *Stubbs, Orebeck & Assoc. v. United States,* 445 F.2d 1142, 1147 (5th Cir.1971).

This court agrees with the reasoning developed in *Sims v. United States* that:

Administrative interpretations are not absolute rules of law which must necessarily be followed in every instance, but are only helpful guides to aid courts in their task of statutory construction. The extent to which a court will place reliance upon an administrative interpretation depends on the circumstances, including the general purpose of the act, the authoritative source of the regulation or ruling, the clarity of the statutory language, the consistency of administrative policy, and whether administrative interpretation was brought to the attention of

the legislators when they re-enacted, modified, or refused to change the statute.

*Sims v. United States*, 252 F.2d 434, 438 (4th Cir., 1958), *aff'd*, 359 U.S. 108, 79 S.Ct. 641, 3 L.Ed.2d 667 (1959). In the instant case, the IRC section 902(c)(1) is clear on its face, and Treasury Regulation 1.902–1(g)(4) is not inconsistent with the statute.

The section of the United States–United Kingdom Income Tax Convention critical to the instant case is Article 23 (Elimination of Double Taxation):

### Article 23—Elimination of Double Taxation

(1) *In accordance with the provisions and subject to the limitations of the law of the United States* (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or national of the United States as a credit against the United States tax the appropriate amount of tax paid to the United Kingdom; and, in the case of a United States corporation owning at least 10 percent of the voting stock of a corporation which is a resident of the United Kingdom from which it receives dividends in any taxable year, the United States shall allow credit for the approximate amount of tax paid to the United Kingdom by that corporation with respect to the profits out of which such dividends are paid. Such appropriate amount shall be based upon the amount of tax paid to the United Kingdom, but the credit shall not exceed the limitations (for the purpose of limiting the credit to the United States tax on income from sources outside the United States) provided by United States law for the taxable year. *For the purposes of applying the United States credit in relation to tax paid to the United Kingdom:*

(a) *the taxes referred to in paragraphs (2)(b) and (3) of Article 2 (Taxes Covered) shall be considered to be income taxes;*

(b) the amount of 5 or 15 per cent, as the case may be, withheld under paragraph (2)(a)(i) or (ii) of Article 10 (Dividends) from the tax credit paid by the United Kingdom shall be treated as an income tax imposed on the recipient of the dividend; and

(c) that amount of tax credit referred to in paragraph (2)(a)(i) of Article 10 (Dividends) which is not paid to the United States corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend shall be treated as an income tax imposed on the United Kingdom corporation paying the dividend.

United States–United Kingdom Income Tax Convention, April 25, 1980, Art. 10(2)(a) (emphasis added).

Article 23 of the United States–United Kingdom Income Tax Convention begins by indicating that a United States tax credit for the amount of tax paid to the United Kingdom shall be allowed, subject to the laws of the United States. The defendant argues that the ACT is not a creditable tax under IRC section 902 because it is not an "income, war profits or excess profits" tax, as required by section 902(a). The defendant maintains that absent Article 23 of the United States–United Kingdom Income Tax Convention, the ACT would not be considered an income tax and, therefore, would not be creditable under IRC section 902.

The Senate Executive Report, No. 95–18, issued by the Senate Foreign Relations Committee, although recommending ratification of the United States–United Kingdom Income Tax Convention, also expressed doubt as to the characterization of United Kingdom Advance Corporation Tax:

Creditability of ACT.—It is open to question whether, *in the absence of the proposed treaty*, the unrefunded ACT would be treated as a creditable income tax for U.S. foreign tax credit purposes. On the one hand, although the unrefunded ACT may be viewed economically as a foreign tax with respect to income of the U.S. shareholders because it is imposed with respect to dividend income paid to them, it is imposed on the paying U.K. corporation rather than the U.S. shareholder receiving the distribution and thus proba-

bly would not be allowed as a direct income tax credit to the U.S. shareholder.

On the other hand, although it is a tax imposed on the paying U.K. corporation, it is not imposed with respect to income of the paying corporation, but rather on all distributions made by the U.K. corporation, whether out of taxable income, out of untaxed earnings, or out of capital. Under present IRS ruling policy, in order for a foreign tax to qualify for the U.S. foreign tax credit, it must be imposed on the net gain of the taxpayer (determined by allowing the deduction of the generally significant expenses incurred in the production of that income), it must be imposed only on income that is realized, and it must be imposed on the receipt of income rather than some other transaction. It would appear that, at least in form, the ACT would not satisfy these criteria. There is, therefore, a reasonable possibility that the ACT would not be viewed by the IRS as a creditable tax *in the absence of the proposed treaty.*

S.Exec.Rep. No. 18, 95th Cong., 2d Sess. 33–34 (emphasis added and footnotes deleted). However, the fact that the Senate Foreign Relations Committee questioned whether, *absent* Article 23 of the United States–United Kingdom Income Tax Convention, ACT would be creditable, is of little help to the defendant. The United States–United Kingdom Income Tax Convention expressly recognizes that the ACT should be treated as an income tax. The language of Article 23(1)(a) of the United States–United Kingdom Income Tax Convention specifically states: "The taxes referred to in paragraphs (2)(b) and (3) of Article 2—Taxes Covered shall be considered income taxes." [16]

However, even if the plaintiff properly attributed the February 25, 1979 dividend of Snap-on Tools, Ltd., to its 1978 accumulated profits under IRC section 902(c)(1), and even if the ACT is an income tax for United States foreign tax credit purposes, this court must still determine whether the United States–United Kingdom Income Tax Convention supersedes and overturns the 60–day rule included in IRC section 902(c)(1). Initially, the court notes, as have both parties, that neither the United States–United Kingdom Income Tax Convention, nor its three Protocols, on their face, expressly abrogate the 60–day rule of IRC section 902(c)(1). In fact, the parties also agree that the 60–day rule is not mentioned in the pre-signing, preparatory materials leading to the negotiated United States–United Kingdom Income Tax Convention, including the notes to the negotiating sessions on Articles 10 and 23 of the Convention. The 60–day rule is first mentioned in the Technical Explanation to the United States–United Kingdom Income Tax Convention [17] which was developed after the bilateral negotiation process was complete, as an aid to the Senate during ratifi-

---

16. Article 2—Taxes Covered

(1) This Convention shall apply to taxes on income imposed by each Contracting State and as hereinafter provided to taxes imposed by its political subdivisions or local authorities.

(2) The existing taxes to which this Convention shall apply are:

\* \* \* \* \* \*

(b) in the case of the United Kingdom, the income tax, the capital gains tax, the corporation tax and the petroleum revenue tax. The foregoing taxes covered are hereinafter referred to as 'United Kingdom tax'; and

(3) This Convention shall also apply to any identical or substantially similar taxes which are imposed by a Contracting State or its political subdivisions or local authorities after the date of signature of this Convention in addition to, or in place of, the existing taxes.

The competent authorities of the Contracting States shall notify each other of any changes which have been made in their respective taxation laws.

\* \* \* \* \* \*

17. The full name for the Technical Explanation (1980–1 C.B. 155) is the "Technical Explanation of the Convention Between the Government of the United States and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains Signed at London, on December 31, 1975, as Amended by the Notes Exchanged at London on April 13, 1976, the Protocol Signed at London on August 26, 1976, and the Second Protocol Signed at London on March 31, 1977, prepared for and submitted to the Senate for hearings held on July 19, and 20, 1977."

cation. The defendant argues in its brief that:

> The Treaty, thus, does not expressly state a rule for determining from which year's profits dividends are to be considered paid for purposes of the Treaty. The Technical Explanation fills this gap, expressly providing such a rule.

■ This court believes that the silence in all the relevant negotiation documents, and in the language of the Convention itself, regarding the application of the 60–day rule to the computation of taxes under the United States–United Kingdom Convention cannot be taken lightly, or taken as abrogating existing United States law on the 60–day rule. This is especially true since Article 23 of the United States–United Kingdom Convention deliberately states that the Convention leaves in place existing United States law by using the words "In accordance with the provisions and subject to the limitations of the law of the U.S." and also includes the direction "provided by the United States law."

The plaintiff submitted the affidavit of Robert J. Patrick, who was International Tax Counsel at the Department of the Treasury from 1973 until the summer of 1976. According to his affidavit, Mr. Patrick was a leader of the United States delegation which negotiated the United States–United Kingdom Income Tax Convention. The Patrick affidavit states that:

> "there were no discussions internally in Treasury, or among the United States negotiating team, regarding application of the 60–day rule found in IRC section 902(c)(1) prior to the signing of the treaty on December 31, 1975. Similarly there were no discussions between the United States and United Kingdom negotiators.... The 60–day rule was not a subject of consideration by the treaty

parties at any time before December 31, 1975."

After the plaintiff initiated proceedings in this court, the defendant moved to suspend the instant case pending forthcoming negotiations of the British and United States Competent Authority representatives [18] on the foreign tax credit issue. According to an affidavit of Philip E. Coates, Associate Commissioner (Operations) of the IRS, attached to defendant's motion for suspension of proceedings, the government expected that, "the competent authorities will consider the application of the 60–day rule under section 902(c)(1) of the Internal Revenue Code in relation to the Advance Corporation Tax imposed under the laws of the United Kingdom." According to the defendant, the anticipated agreement would be "binding on this court" or "highly persuasive evidence of the proper interpretation and application of the Treaty." For whatever reason, however, the Competent Authority Agreement of December 18, 1986 did not expressly address the 60–day rule, although at paragraph 5 it did reiterate the following:

> It is agreed that under the language of article 23(1) which provides that the Article 23(1)(c) credit must be allowed in accordance with the provisions and subject to the limitations of the law of the United States, the timing of the credit is to be determined as a matter of U.S. law.

Paragraph 2 of the Competent Authority Agreement, stated the understanding of both signatories, however, that Article 23(1) of the United States–United Kingdom Income Tax Convention was included for the purpose of ensuring that the ACT would be treated as an income tax:

> It is agreed that Article 23(1)(c) was included in the Convention for the pur-

---

**18.** Article 25 (Mutual Agreement Procedure) of the United States–United Kingdom Income Tax Convention provides that:

> (3) The competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular the competent authorities of the Contracting States may reach agreement on:

> (a) the attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State....

United States–United Kingdom Income Tax Convention, December 31, 1975, Art. 25(3).

pose of ensuring that in accordance with Article 23(1)(a) the Advance Corporation Tax ("ACT") payment which generally underlies the U.K. tax credit referred to in paragraph 1 would be treated as an income tax paid to the United Kingdom by the U.K. corporation paying the dividend, because the United States questioned to what extent, in the absence of the Convention, payments of ACT would be treated as payments of a creditable corporate income tax for U.S. foreign tax credit purposes.

■ The Supreme Court has held that "treaties are the subject of careful consideration before they are entered into, and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purpose of the high contracting parties." *Rocca v. Thompson*, 223 U.S. 317, 332, 32 S.Ct. 207, 210, 56 L.Ed. 453 (1912). Interpretation of a treaty, therefore, must begin with the language of the treaty itself. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982). In *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 11, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936), Mr. Chief Justice Hughes noted as follows:

> Examining the treaty in that aspect, it is our duty to interpret it according to its terms. These must be fairly construed, but we cannot add or detract from them.

*Valentine*, 299 U.S. at 11, 57 S.Ct. at 103.

■ There is also a line of established case law which dictates that treaties are to be considered akin to contracts between independent nations. *De Geofroy v. Riggs*, 133 U.S. 258, 271, 10 S.Ct. 295, 298, 33 L.Ed. 642 (1890); *see also Santovincenzo v. Egan*, 284 U.S. 30, 52 S.Ct. 81, 76 L.Ed. 151 (1931). The general rules of construction applicable to government contracts involving the United States as a party dictate that the interpretation of a government contract is a matter of law. *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.

Cl. 384, 386, 351 F.2d 972, 973 (1965). The language of a contract should be given the meaning that would be derived from the contract by a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Id.*, 169 Ct.Cl. at 388, 351 F.2d at 975.[19] Moreover, when interpreting the language of a contract, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir.1983). According to the Supreme Court:

> It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. As they are contracts between independent nations, in their construction words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended.

*De Geofroy v. Riggs*, 133 U.S. at 271, 10 S.Ct. at 298.

■ Only when the language of a contract is ambiguous will factors outside of the contract terms be taken into account. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[W]hen the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances, such as prior negotiations or custom of the trade for its interpretation." *Peterson–Sharpe Eng'g Corp. v. United States*, 6 Cl.Ct. 288, 295 (1984) (citing *David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 419–20, 557 F.2d 249, 256 (1977)); *see also Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978); *Sylva-*

---

**19.** Once again, the reader is directed to Holmes, *The Theory of Legal Interpretation.* 112 Harv. L.Rev. 417, 419 (1899): "For each party to a contract has notice that the other will understand his words according to the usage of the normal speaker of English under the circumstances, and therefore cannot complain if his words are taken in that sense."

*nia Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972); *Northwestern Industrial Piping, Inc. v. United States,* 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *Perry & Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (citing *Duhame v. United States,* 127 Ct.Cl. 679, 683, 119 F.Supp. 192, 195 (1954)).

▮ It does appear, however, that in the case of treaties, courts have sometimes been more willing to resort to extra-textual, preparatory material to determine meaning, and also to allow for more liberal interpretation of the words of a treaty. In such instances the decision of the courts to resort to sources beyond the treaty language and/or to a more liberal interpretation of the written word often has occurred because the treaty language is not completely clear and requires further explanation. *See Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 195–96, 78 L.Ed. 315 (1933); *Nielson v. Johnson,* 279 U.S. 47, 52, 49 S.Ct. 223, 224, 73 L.Ed. 607 (1929). As stated by the Supreme Court in *United States v. Texas:* "Undoubtedly, the intention of the two governments, as gathered from the words of the treaty, must control; and the entire instrument must be examined in order that the real intention of the contracting parties be ascertained." *United States v. Texas,* 162 U.S. 1, 36–37, 16 S.Ct. 725, 733, 40 L.Ed. 867 (1895); *see also Jordan v. Tashiro,* 278 U.S. 123, 127, 49 S.Ct. 47, 48, 73 L.Ed. 214 (1928).

The Supreme Court focused on the treaty interpretation issue clearly in *United States v. Stuart,* 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989), in Justice Brennan's majority Opinion, and in the concurring Opinions of Justices Scalia, Kennedy and O'Connor. The majority Opinion reiterated a position taken earlier by the Supreme Court in *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) to the effect that:

> the clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent

with intent or expectations of its signatories. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 [102 S.Ct. 2374, 2377, 72 L.Ed.2d 765] (1982), quoting *Maximov v. United States,* 373 U.S. 49, 54 [83 S.Ct. 1054, 1057, 10 L.Ed.2d 184] (1963).

*United States v. Stuart,* 489 U.S. at 366, 109 S.Ct. at 1191 (Brennan, J.). However, in his concurring Opinion in *United States v. Stuart,* Justice Scalia instructed that the *Sumitomo Shoji* Court misapplied the *Maximov* case on which it so heavily relied:

> In *Maximov,* confronted with an argument appealing to the 'intent or expectations' of the signatories, we responded that '[t]he immediate and compelling answer to this contention is that ... the language of the Convention itself not only fails to support the petitioner's view, but is contrary to it.' *Maximov v. United States,* 373 U.S. 49, 54 [83 S.Ct. 1054, 1057, 10 L.Ed.2d 184] (1963). We then continued: 'Moreover, it is *particularly* inappropriate for a court to sanction a deviation from the clear import of a solemn treaty ... when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.' *Ibid.* (emphasis added). The import of the highlighted adverb is, of course, that it would be inappropriate to sanction a deviation from clear text *even if there were* indications of contrary intent. Our *Sumitomo* dictum separated the last clause of this quotation from its content to support precisely the opposite of what it said. Regrettably, that passage from *Sumitomo* is already being quoted by lower courts as '[t]he general rule in interpreting treaties.' *Rainbow Navigation, Inc. v. Department of Navy,* 686 F.Supp. 354, 359, n. 25 (DC 1988).

> Notwithstanding the *Sumitomo* dictum to which the Court alludes, our traditional rule of treaty construction is that an agreement's language is the best evidence of its purpose and its parties' intent.

*United States v. Stuart,* 489 U.S. at 372, 109 S.Ct. at 1194 (Scalia, J.). This court agrees with Justice Scalia's interpretation in the *Maximov* case. Likewise, Justice Kennedy, in a second concurring Opinion, in *United States v. Stuart,* in which Justice O'Connor joined, wrote as follows:

I agree with JUSTICE SCALIA that we should not reach, either in a direct or an implicit way, the question whether Senate debates on ratification are authoritative or even helpful in determining what the signatories to a treaty intended. That determination should be reserved until we confront a case where the language of the treaty itself does not yield a clear answer to the question before us. For these reasons, I join the judgment of the Court and all but Part II–C of the Court's opinion.

*United States v. Stuart,* 489 U.S. at 370, 109 S.Ct. at 1193 (Kennedy, J.).

■■■■■ As stated by Justice Scalia, this court believes that the language of the agreement is the best evidence of the intent of the parties and of the purpose of the treaty. Moreover, in the case at bar, the clear intent of both parties should not be ascertained from the Technical Explanation to the United States–United Kingdom Income Tax Convention on which the defendant relies so heavily in support of its position. There simply is not evidence in the record, as is discussed more fully below, to support the notion that the British government was aware that the words of the United States–United Kingdom Income Tax Convention were intended to change the 60–day rule. The Convention is silent regarding any change to the 60–day rule, although it is not silent that existing United States income tax provisions, not addressed by the Convention, presumably including IRC section 902(c)(1), should apply and remain in effect following the effective date of the Convention.

■■■■ In the instant case, the court is asked to rule on the reconciliation of a statute, IRC section 902(c)(1), and a treaty, the United States–United Kingdom Income Tax Convention. On the subject of how to resolve a conflict between a statute and a subsequently signed treaty to resolve a case such as the one at bar, *United States v. Lee Yen Tai,* 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878 (1902) is very instructive:

That it was competent for the two countries by treaty to have superseded a prior act of Congress on the same subject is not to be doubted; for otherwise the declaration in the Constitution that a treaty, concluded in the mode prescribed by that instrument, shall be the supreme law of the land, would not have due effect. As Congress may by statute abrogate, so far at least as this country is concerned, a treaty previously made by the United States with another nation, so the United States may by treaty supersede a prior act of Congress on the same subject. In *Foster & Elam v. Neilson,* 2 Pet. 253, 314 [7 L.Ed. 415], it was said that a treaty was 'to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision.' In the case of *The Cherokee Tobacco,* 11 Wall. 616, 621 [20 L.Ed. 227], this court said 'a treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty.' ... Again, in *Whitney v. Robertson,* 124 U.S. 190, 194 [8 S.Ct. 456, 458, 31 L.Ed. 386]: 'By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the court will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always that the stipulation of the treaty on the subject is self-executing.' See also *Taylor v. Morton,* 2 Curtis, 454, 459; *Clinton Bridge Case,* 1 Woolworth, 155; *Ropes v. Church,* 8 Blatchf. 304; 2 Story on Const., § 1838. Nevertheless, the purpose by statute to abrogate a treaty or any designated part of a treaty, or the purpose by treaty to supersede the whole

or a part of an act of Congress, must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute or in the treaty.

In the case of statutes alleged to be inconsistent with each other in whole or in part, the rule is well established that effect must be given to both, if by any reasonable interpretation that can be done; that 'there must be a positive repugnancy between the provisions of the new laws and those of the old; and even then the old law is repealed by implication only *pro tanto*, to the extent of the repugnancy;' and that 'if harmony is impossible, and only in that event, the former is repealed in part or wholly, as the case may be.' *Wood v. United States,* 16 Pet. 342, 363 [10 L.Ed. 987]; *United States v. Tynen,* 11 Wall. 88, 93 [20 L.Ed. 153]; *State v. Stoll,* 17 Wall. 425, 431 [21 L.Ed. 650]. In *Frost v. Wenie,* 157 U.S. 46,, 58 [15 S.Ct. 532, 536, 39 L.Ed. 614], this court said: 'It is well settled that repeals by implication are not to be favored. And when two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court—no purpose to repeal being clearly expressed or indicated—is, if possible, to give effect to both. In other words, it must not be supposed that the legislature intended by a later statute to repeal a prior one on the same subject, unless the last statute is so broad in its terms and so clear and explicit in its words as to show that it was intended to cover the whole subject, and, therefore, to displace the prior statute.'

\* \* \* \* \* \*

Like principles must control when the question is whether an act of Congress has been superseded in whole or in part by a subsequent treaty. A statute enacted by Congress expresses the will of the people of the United States in the most solemn form. If not repugnant to the Constitution, it is made by that instrument a part of the supreme law of the land, and should never be held to be displaced by a treaty, subsequently concluded, unless it is impossible for both to stand together and be enforced.

*United States v. Lee Yen Tai,* 185 U.S. at 220–22, 22 S.Ct. at 632–33. *See also Blanco v. United States,* 775 F.2d 53, 61 (2d Cir.1985).[20]

■ The general rules of statutory and treaty construction would dictate that when the two are inconsistent, or irreconcilable, the last in time should take precedence. In the case at bar, however, the two do not create an irreconcilable conflict, and can be resolved by their own terms. No evidence, other than the Technical Explanation, exists to suggest that the United States–United Kingdom Income Tax Convention was intended to substitute for, or set aside, any part of IRC section 902. There is no mention of a repeal of the 60–day rule in the Convention itself, and, in fact, there is positive evidence to the contrary in Article 23 of the United States–United Kingdom Income Tax Convention and the Competent Authority Agreement. Both the Income Tax Convention and the Competent Authority Agreement state that the provisions of the Income Tax Convention are subject to the limitations of the laws of the United States. Thus, prior to the 1986 Tax Code revision, which eliminated the 60–day rule, it should be permissible to account for dividends paid in the first 60 days of the year following the accumulation of the profits by using the 60–day rule.

Under analogous circumstances, the United States Court of Claims noted that the United States–United Kingdom Income Tax Convention did not explicitly provide for the payment or nonpayment of interest, and stated that "[w]hen the draftsmen of treaties intended to deny interest, they knew how to do so." *Brown & Williamson, Ltd. v. United States,* 231 Ct.Cl. 413, 420, 688 F.2d 747, 751 (1982), *acq'd,* Rev.

---

**20.** In like fashion, the established rules of statutory construction strongly disfavor repeals of statutes by implication. *See, e.g., Traynor v. Turnage,* 485 U.S. 535, 547, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988); *United States v. Fausto,* 484 U.S. 439, 452, 108 S.Ct. 668, 676, 98 L.Ed.2d 830 (1987) (citing *Rodriguez v. United States,* 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987)); *Broughton Lumber Co. v. Yeutter,* 939 F.2d 1547, 1557 (Fed.Cir.1991).

Rul. 84–133, 1984–2 C.B. 309, 310. The *Brown* court found that the previously enacted provisions of the IRC were applicable to dispose of the issue. The United States Court of Claims further determined that: "Although the 1980 treaty created the right to a retroactive refund of taxes, it is section 6611 of the Code that creates a right to interest upon the refunded taxes." *Brown & Williamson,* 231 Ct.Cl. at 421, 688 F.2d at 752.

This court believes that no language included in the United States–United Kingdom Income Tax Convention expressly overrules, or was intended to overrule, the statutory provisions of IRC section 902(c)(1). However, this Opinion also addresses the available preparatory, extra-textual materials to the United States–United Kingdom Income Tax Convention, including the Technical Explanation, which is the only document in the preparatory materials to specifically address the 60–day rule. The court observes that the notes of the negotiators to the United States–United Kingdom Income Tax Convention, the official protocols to the Convention, and the Competent Authority Agreement, all are silent on the 60–day rule. In fact, the defendant admits by stipulation that the official notes of the negotiating sessions in which Articles 10 and 23 of the United States–United Kingdom Income Tax Convention are discussed contain no reference whatsoever to either the details of the credit for the ACT or of the application of the 60–day rule.

The Technical Explanation [21] was prepared in March 1977, and submitted to the Senate Foreign Relations Committee to assist in the considerations of the United States–United Kingdom Income Tax Convention by the United States Senate. Although this document may be viewed as part of the Convention preparatory materials, it was prepared for the United States Senate for use in the ratification process. It was not part of the contemporaneous history of the bilateral negotiations between the United States and the United Kingdom, which resulted in the signing of the Income Tax Convention, but was prepared after conclusion of the negotiations.[22] Article 23, paragraph 2 of The Technical Explanation contains the following language:

A distribution in respect of which the ACT paid reduces mainstream tax for the current taxable year *may* be treated by the Internal Revenue Service as made first out of the entire profits of that year (computed as of the close of the year). This rule, which *applies regardless of whether the distribution is made in the first 60 days of the taxable year,* will be applied *where necessary* to prevent crediting of a prior year's mainstream tax unreduced by ACT, while at the same time using such ACT to reduce the current year's mainstream tax. (emphasis added).

The Technical Explanation, however, also states that "a distribution in respect of which the ACT paid reduces mainstream tax for the current taxable year may be treated by the Internal Revenue Service as made first out of the entire profits of that year." The use of the word "may" instead of "shall," "will" or "must" suggests that the rule is not to be applied in every situation. The Technical Explanation goes on to say that the rule "will be applied where necessary to prevent crediting of a prior

**21.** According to a footnote to the Technical Explanation, it is the practice of the Treasury Department to prepare for the use of the Senate and other interested persons a Technical Explanation of tax conventions and protocols, which are submitted to the Senate for its use during the proceedings associated with advice and consent to ratification of a treaty. This Technical Explanation was submitted to the Senate Foreign Relations Committee at hearings held on July 19–20, 1977, and has been amended to reflect the testimony of the Department of Treasury before the same committee on June 6, 1979, (Treasury News Release M–145, dated October 25, 1979), and to make minor corrections.

**22.** The parties have stipulated that:

[T]he position that the Department of the Treasury takes in the Technical Explanation respecting the applicability of the '60–day rule' of Section 902(c), Internal Revenue Code of 1954, under the Treaty appears to have been developed by Treasury Department personnel some time between November 1, 1976 and March 1, 1977.

year's mainstream tax unreduced by ACT, while at the same time using such ACT to reduce the current year's mainstream tax." The use of key words "where necessary" also implies that the rule is not an absolute requirement, but instead applies in certain circumstances only.

The chronology of events leading up to ratification of the United States–United Kingdom Income Tax Convention are pertinent in determining the weight of the preparatory materials. On December 31, 1975, the United States–United Kingdom Income Tax Convention was signed. The State Department transmitted the United States–United Kingdom Income Tax Convention to the President, and on June 24, 1976, the President submitted the Convention to the Senate. In mid-July, 1977, the Department of the Treasury submitted the Technical Explanation of the United States–United Kingdom Income Tax Convention to the Senate Foreign Relations Committee for use during the hearing on the Convention held on July 19–20, 1977. On April 25, 1978, the Senate issued Executive Report No. 95–18, regarding the Senate's consideration of the United States–United Kingdom Income Tax Convention. On June 17, 1978, the Senate voted its advice and consent to the United States–United Kingdom Income Tax Convention and did not attach any reservation regarding the 60–day rule to its ratification. Instruments of ratification were exchanged on March 25, 1980, and the Convention became effective following 30 days thereafter, on April 25, 1980.

The defendant maintains that the application of the 60–day rule would distort the "intended operation of the Treaty formula." The defendant claims that if the 60–day rule is applied, the ACT would reduce the current year's United Kingdom mainstream tax, while the United States foreign tax credit would be calculated by use of the previous year's United Kingdom corporate income taxes, which would not have been reduced by the ACT credit. Therefore, the defendant alleges that the United States–

United Kingdom Income Tax Convention negotiators intended that the tax credit calculation should be made on the basis of a United Kingdom corporate income tax reduced by the ACT paid, or, as otherwise stated:

> the Treaty's overall tax refund and credit formula will produce its intended result if, and only if, a dividend that triggers a payment of ACT is attributed to the accumulated profits of the year whose mainstream tax is reduced by the ACT, that is, *generally*, the year of distribution. (Emphasis added.)

The defendant opines that it is the Technical Explanation which correctly interprets the United States–United Kingdom Income Tax Convention. In support, the defendant offers the prepared statement on the United States–United Kingdom Income Tax Convention of Paul J. Oosterhuis and David Brockway, both of whom worked for the Joint Committee on Taxation: [23]

> In addition, the technical explanation of the treaty issued by the Treasury Department details the manner in which U.K. corporate taxes are to be treated in determining the amount of the indirect foreign tax credit which will be allowed to U.S. direct investors. It is our understanding that the basic treatment provided in the technical explanation was specifically part of the negotiated agreement with the United Kingdom. The result of the treatment provided in the treaty and the technical explanation is that the benefit of the ACT refund tends to accrue to the U.S. direct investors. Although it is not clear what the U.S. foreign tax credit treatment would be in the absence of the treaty, the agreement by the United States to apply the generally favorable tax credit rules is an important concession to the United Kingdom which will make U.S. direct investment in the United Kingdom more attractive.
>
> In this connection, it should be observed that the technical explanation is the first more or less comprehensive pub-

---

**23.** Paul J. Oosterhuis was Legislative Counsel, Joint Committee of Taxation, and David Brock- way was Legislative Attorney, Senate Foreign Relations Committee.

lic statement made by the Treasury Department (either with respect to a treaty or with respect to the proper interpretation of the Internal Revenue Code in the absence of a treaty) on the general question of how to treat foreign corporate taxes for purposes of our indirect foreign tax credit in cases where the amount of foreign corporate taxes paid varies with the amount of dividends distributed. The problems presented in this context are exceedingly complex and a thorough examination has not been conducted as to what the appropriate rules should be. The court does not believe, however, that the above, quoted statement lends much support to the defendant's position because there is no specific discussion or even mention of the 60–day rule therein by Messrs. Oosterhuis or Brockway. Moreover, by its own terms, the Oosterhuis/Brockway statement clearly suggests that the appropriate rules for application of the Convention have not yet been determined.

■ In the case of interpretation of statutes, legislative history, including any Committee Reports and statements included in the legislative record, provide only indicia of congressional intent, and may be referred to only in instances when the statutory terms are ambiguous and the intent is unclear. *See Burlington Northern R.R. v. Oklahoma Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete.") As stated recently in *Foreman v. United States:* "where intentions of committees conflict with the express provisions of an existing law, these intentions cannot be read into a statute that is otherwise silent on the subject." *Foreman v. United States*, 26 Cl.Ct. 553, 562 (1992). Therefore, the court believes that similarly, the Technical Explanation should not be read into the United States–United Kingdom Income Tax Convention, which is silent on the 60–day rule.

■ The defendant claims that the Technical Explanation should be followed because it has official IRS backing in Reve-

nue Procedure 80–18, 1980–1 C.B. 623, which was issued to set forth procedures to be followed in applying the United States–United Kingdom Income Tax Convention. Revenue Procedure 80–18, issued on April 25, 1980, requires taxpayers claiming a refund of ACT tax to apply the Technical Explanation rules. Revenue Procedure 80–18, however, simply announces the IRS position on the issue; it lacks binding precedential value on this court. In *State Bank of Albany v. United States*, 209 Ct.Cl. 13, 530 F.2d 1379 (1976), the Court of Claims stated that a revenue ruling "is merely the opinion of a lawyer in the agency and must be accepted as such. It may be helpful in interpreting a statute, but it is not binding on ... the courts." *Id.*, 209 Ct.Cl. at 19, 530 F.2d at 1382 (quoting *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146–47 (5th Cir.1971)); *see also Biddle v. Commissioner*, 302 U.S. at 582, 58 S.Ct. at 383.

As discussed above, there is no disagreement between the parties in the instant case that the United States–United Kingdom Income Tax Convention, the Protocols, and the Competent Authority Agreement, are all silent as to the disputed issues regarding the application of the 60–day rule. The defendant, however, relies heavily on the Technical Explanation, the only relevant document containing a reference to the 60–day rule, to plug the alleged loophole, denominated by the parties as the "gap," in the United States–United Kingdom Income Tax Convention, given the silence of the Convention on the 60–day rule. The defendant urges this court to follow the position taken in *Xerox Corp. v. United States*, 14 Cl.Ct. 455 (1988), on the issue of the weight to be accorded the Technical Explanation. This court is persuaded, however, that the *Xerox* case is not dispositive of the issue currently before the court.

In *Xerox*, the court was asked to award the plaintiff an indirect foreign tax credit, pursuant to Article 23(1)(c) of the same United States–United Kingdom Income Tax Convention. In a thoughtful and thorough Opinion, the *Xerox* court denied the plain-

tiff the relief requested. The court in *Xerox* wrote:

> To better determine the intent of the treaty parties with respect to the applicability of the Article 23(1)(c) credit, it is appropriate to examine the official pronouncements of the United States (and the United Kingdom) in connection with the ratification and implementation of the Convention. *Air France v. Saks*, 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985); '[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943)).

*Xerox*, 14 Cl.Ct. at 463.

The *Xerox* court was more willing than this court to go beyond the words of the United States–United Kingdom Income Tax Convention and to resort to examination of the intent of the parties by examining the pronouncements surrounding the development of the United States–United Kingdom Income Tax Convention, including the Technical Explanation. This court has previously discussed its position that because the United States–United Kingdom Income Tax Convention is silent on the 60–day rule and specifically refers the United States taxpayer back to the IRC, for the years at issue, in the instant case, resort to the preparatory materials should not be necessary under common notions of statutory and treaty interpretation.[24]

This Opinion previously quoted at length from the language of the Supreme Court in *United States v. Lee Yen Tai*, 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878 (1902), to support the proposition that a statute should not be found to be repealed by a subsequent treaty unless it is impossible for the language of the statute and the treaty to stand together. In the instant case, this court sees no irreconcilable difference between the statutory provisions at issue and the Convention. Only the words included in the Technical Explanation, drafted to facilitate the ratification process in the United States Senate, written after the United States–United Kingdom Income Tax Convention was negotiated, suggest that the 60–day rule was negated by the Income Tax Convention. The Convention itself is silent on the issue at bar.

■ This court does not take issue with certain of the principles articulated in *Sumitomo Shoji America, Inc. v. Avagliano* and relied on by the *Xerox* court, as follows:

> Although not conclusive, the meaning attributed to treaty provisions by the Government *agencies* charged with their negotiation and enforcement is entitled to great weight. *Kolovrat v. Oregon*, 366 U.S. 187, 194 [81 S.Ct. 922, 926, 6 L.Ed.2d 218] (1961).

*Xerox Corp. v. United States*, 14 Cl.Ct. at 463 (citing *Sumitomo Shoji/American, Inc. v. Avagliano*, 457 U.S. at 184–85, 102 S.Ct. at 2379). This court also agrees with the *Sumitomo* court that:

> Our role [the role of the United States Supreme Court] is limited to giving effect to the intent of the Treaty *parties*. When the *parties* to a treaty *both* agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation.

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. at 184–85, 102 S.Ct. at 2379 (emphasis added).

---

**24.** Moreover, contrary to the defendant's reading of the *Xerox* case, it is not clear from a comparison of the *Xerox* case and the one currently before this court, that the decision of this court and the Opinion in *Xerox* cannot be reconciled. It does not seem from a reading of *Xerox* that the fact patterns in the *Xerox* case and the case at bar are entirely analogous. In *Xerox,* it appears that the court was interpreting language included in the United States–United Kingdom Income Tax Convention. In the instant case, the court is presented with a situation in which the language of the United States–United Kingdom Income Tax Convention is silent on the question before the court. However, the words of the Convention specifically refer the parties back to existing IRC provisions for resolution of the disputed claims.

In *Sumitomo,* the Supreme Court discussed the importance of endorsing the meaning attributed to treaty provisions by *both* parties to the treaty. The history of the United States–United Kingdom Income Tax Convention, however, does not evidence a conscious repeal of the 60–day rule by both signatories to the Convention. In fact, there is evidence in the record to suggest that neither the Americans nor the British were expecting the Convention to repeal the 60–day rule. Although the Technical Explanation was before the United States Senate when it ratified the United States–United Kingdom Income Tax Convention, there is no indication in the legislative record that the Senate members, when voting, were aware that the effect of ratifying the Convention would be to repeal the 60–day rule. No reservations were attached to the ratification by the Senate. This court, therefore, is not persuaded, as was the *Xerox* court, that: "it is logical to conclude that the Senate was in accord with Treasury Department's interpretation of Article 23 as set forth in the Technical Explanation when it ratified the US–UK Income Tax Treaty in 1978–79." *Xerox Corp. v. United States,* 14 Cl.Ct. at 463.

The Senate Executive Report also supports the reasoning adopted by the instant Opinion, as follows:

> In recommending the ratification of the treaty, the Committee does not intend to adopt or reject the amplifications of the foreign tax credit rules contained in the Treasury technical explanation. Consequently, Treasury would not be foreclosed by the ratification of the treaty from modifying those administrative interpretations in the future should it deem it advisable to do so. Of course, the rules contained in the treaty also do not limit any legislative action in this area, the computation of the foreign tax credit for unrefunded ACT may be subject to any generally applicable changes in the U.S. foreign tax credit rules which may subsequently be enacted.

S.Exec.Rep. 95–18 at 36–37, reprinted in 1980–81 Cum.Bull. at 429 (emphasis added).

■ Moreover, this court does not agree with the *Xerox* court regarding how the British viewed the impact of the United States–United Kingdom Income Tax Convention on the 60–day rule:

> Similarly, the record indicates at least *tacit acceptance* by the U.K. of the U.S. interpretation of Article 23(1)(c) as set forth in the Technical Explanation. As stated in the affidavit of Steven P. Hannes, who was a member of the U.S. negotiating team in 1975 and an attorney for Treasury during the U.S. Senate's consideration of the treaty, 'copies of the Technical Explanation would have been sent to the U.K. negotiators.' Knowledge of the U.S. interpretation, therefore, was clearly before the House of Commons during its own ratification debate. The U.K. ratified the Convention in the form approved by the U.S. Senate, without further reservation or amendment, by enacting section 16 of the Finance Act (No. 2) 1979, dated July 26, 1979 (emphasis added).

*Xerox Corp. v. United States,* 14 Cl.Ct. at 463–64. Similarly, the court does not agree with the *Xerox* court that: "the Technical Explanation which formed the basis of the Senate's understanding of the Convention ... was *tacitly accepted* by the United Kingdom prior to its own ratification...." *Xerox Corp. v. United States,* 14 Cl.Ct. at 468 (emphasis added). The *Xerox* court appears to have taken the position that since the United Kingdom voiced no objection to the Technical Explanation, the United Kingdom "tacitly" accepted the provisions articulated in the Technical Explanation. This court believes, however, that an understanding of a position which forms the basis for a negotiated international agreement cannot be arrived at "tacitly," but must be achieved consciously and deliberately by both parties.

Moreover, there is no positive evidence in the record that the United Kingdom intended the United States–United Kingdom Income Tax Convention to bar the application of the 60–day rule included in IRC section 902(c)(1). According to a 1976 *British Tax Review* article, which discussed the ACT rate on distributions of various percentages

of earnings in the context of the proposed Income Tax Convention:

The table assumes that pre-tax subsidiary earnings equate to earnings as computed for United States tax purposes. It also assumes that dividends are paid in the period when the earnings arise. If the dividends were paid within the first sixty days of the succeeding accounting period and related back to the earlier accounting period then the underlying tax would be calculated on the tax paid on the profits of that earlier period, but the ACT paid on the dividend would under the United Kingdom law be set off against the tax liability on the profits of the later accounting period.

W.B. Taylor and J.D.B. Oliver, The Proposed United States–United Kingdom Double Taxation Agreement, 1976 *British Tax Review* 166.

Therefore, given the apparent absence of agreement by the parties on a repeal of the 60–day rule (a question not at issue in the *Xerox* case), this court looks to the words of the United States–United Kingdom Income Tax Convention, which is silent on the 60–day rule. Therefore, the Convention directs the taxpayer back to the applicable United States Tax Code provisions, which, for plaintiff's applicable tax years, includes the 60–day rule.

Article 27 (Effect on Diplomatic and Consular Officials and Domestic Laws) of the United States–United Kingdom Income Tax Convention includes the following language:

(2) this Convention shall not restrict in any manner any exclusion, exemption, deduction, credit, or other allowances now or hereafter accorded by the laws of either Contracting state.

The Senate Report, when discussing Article 27 (Effect on Diplomatic and Consular Officials and Domestic Laws), utilizes essentially the same language:

In addition, the proposed treaty contains the rule found in other U.S. tax treaties that its provisions do not restrict in any manner any exclusion, exemption, deduction, credit, or other allowances accorded by the laws of either country. Thus the proposed treaty can only be applied when it benefits a taxpayer.

S.Exec.Rep. No. 18, 95th Cong., 1st Sess. (1978).

Finally, even the Technical Explanation so heavily relied upon by the defendant, contains similar language:

Article 27. Effect on Diplomatic and Consular Officials and Domestic Laws.

\* \* \* \* \* \*

Paragraph (2) provides that the Convention will not restrict in any manner any exclusion, exemption, deduction, credit or other allowance now or hereafter accorded by the laws of a Contracting State. This rule reflects the principle that a Convention should not increase the tax burden on residents of the Contracting States.

More recently, the Competent Authority Agreement on the United States–United Kingdom Income Tax Convention, eagerly anticipated by the defendant, and issued on December 18, 1986, also did not address the 60–day rule specifically. The Competent Authority Agreement, once again, refers the taxpayer back to the IRC for guidance, as follows:

It is agreed that under the language of Article 23(1) which provides that the Article 23(1)(c) credit must be allowed in accordance with the provisions and subject to the limitations of the law of the United States, *the timing of the credit is to be determined as a matter of U.S. law.* (Emphasis added.)

Of additional interest is Private Letter Ruling 7602251120A, dated February 25, 1976, which was issued less than two months after the Treasury Department officials completed negotiations for the United States–United Kingdom Income Tax Convention. In this Private Letter Ruling, the IRS stated that under the Convention, a taxpayer who received a distribution from its United Kingdom subsidiary within the first 60 days of the year, must apply the 60–day rule and treat the distributions as paid out of the prior year's accumulated profits with the following words: "Comparison of Section 902 and Article 23 of the

proposed Treaty indicates that Article 23 has incorporated the rules of Section 902 into Article 23 of the Treaty."

The plaintiff, in its reply to the defendant's cross-motion, notes, that given the breadth of an affidavit of Steven P. Hannes, originally submitted as part of the record by the defendant, the silence of that affidavit on the issue of whether the 60–day rule was the subject of consideration at any time before the treaty was signed is significant.[25]

Also, of definite interest and persuasive significance is the fact that the 60–day provision included in section 902(c)(1) of the IRC was specifically repealed, a number of years after the Technical Explanation was written, effective December 31, 1986, in the Tax Reform Act of 1986, Pub.L. No. 99–514, § 1202(a), 100 Stat. 2085, 2529. It was thus the perception by the Congress that there was a need to explicitly take legislative action to repeal the 60–day provision and to plug the loophole between the United States–United Kingdom Income Tax Convention and section 902 of the pre-Tax Reform Act of 1986 version of the IRC. Although in the case at bar, the plaintiff may have taken advantage of this loophole, the Department of the Treasury should not

be allowed to alter the result for the 1979 or 1981 tax years by resort to the Technical Explanation and Revenue Procedure 80–18.

In *Johnson v. Browne*, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907), the Supreme Court stated as follows:

> Repeals by implication are never favored, and a later treaty will not be regarded as repealing an earlier statute by implication, unless the two are absolutely incompatible and the statute cannot be enforced without antagonizing the treaty. *United States v. Lee Yen Tai*, 185 U.S. 213 [22 S.Ct. 629]. If both can exist the repeal by implication will not be adjudged.

*Johnson v. Browne*, 205 U.S. at 321, 27 S.Ct. at 542.

 This court does not disagree with the defendant that the Department of Treasury can change earlier interpretations of law through the issuance of formal decisions or issuance of revisions to one of the regulations. *See Dickman v. Commissioner*, 465 U.S. 330, 342–43, 104 S.Ct. 1086, 1093–94, 79 L.Ed.2d 343, *reh'g den.*, 466 U.S. 945, 104 S.Ct. 1932, 80 L.Ed.2d 477 (1984); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707,

---

**25.** The defendant, in its cross-motion for partial summary judgment, frequently cites to the affidavit of Steven P. Hannes, Group Chief, International Rulings Group, Corporate Tax Division, Internal Revenue Service from February 1975 until November 1976 and a member of the United States delegation which negotiated the Income Tax Convention with the United Kingdom in 1975, and who from November 1976 until March 1982, participated in drafting the Technical Explanation to the United States–United Kingdom Income Tax Convention as a Treasury Department employee. However, in its reply brief, defendant asserts that:

> All matters referred to in the Hannes affidavit, however, are also clearly established by the Treaty itself, the legislative history of the Treaty (including the Technical Explanation), and in the stipulated facts in this case …

> In sum, the Hannes affidavit, though convenient in form is, as a matter of evidence, merely cumulative. In light of plaintiff's objection to the Hannes affidavit, and because the matters referred to therein are established by other sources in the record in this case, we will no longer rely on that affidavit. Accordingly, we hereby withdraw the Hannes affidavit from this case for all purposes.

The plaintiff, in its reply to the defendant's cross-motion, notes, that given the breadth of an affidavit of Steven P. Hannes, originally submitted as part of the record by the defendant, the silence of that affidavit on the issue of whether the 60–day rule was the subject of consideration at any time before the treaty was signed is significant.

The plaintiff argues that:

> the existence of the affidavit in this case for over 14 months cannot be regarded as a nullity. It was the *piece de resistance* in defendant's initial brief; indeed, it was difficult to discern where the affidavit left off and defendant's initial brief began. Its existence ultimately allowed the court to focus upon one of the many inconsistencies inherent in defendant's position on this issue. The Court should now regard the history of the Hannes affidavit as indicative of defendant's quixotic effort to bridge the "gap" which defendant acknowledges. (Emphasis in original).

At oral argument, the court inquired about the attempted withdrawal by the defendant of the Hannes affidavit. Subsequently, the court accepted defendant's motion to withdraw the Hannes affidavit.

1 L.Ed.2d 746 *reh'g den.*, 353 U.S. 989, 77 S.Ct. 1279, 1 L.Ed.2d 1147 (1957). Regulation changes or Revenue Rulings are sometimes used to plug omissions in statutes or to reinterpret vague statutory guidance. At the same time, however, the Secretary is not authorized to impose a tax on income that would not otherwise be taxed under existing treaties and statutes. *See American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 417, 602 F.2d 256, 261 (1979). Here, the Executive Branch should not be allowed to amend a treaty on which the treaty is silent by suggesting changes in the Technical Explanation. The United States–United Kingdom Income Tax Convention clearly refers the taxpayer back to the applicable United States Code provisions. At the time relevant to the suit at bar, the 60–day rule was included in IRC section 902(c)(1).

 Moreover, despite the defendant's claim that the Secretary of the Treasury has discretion, which the defendant argues has been properly exercised in the instant case, this court is struck by the fact that neither the Secretary of the Treasury nor the taxpayer herein have made any showing in the instant case that the dividends were paid from other than the 1978 profits of Snap-on Tools, Ltd. The plaintiff and the defendant in the case at bar agree that the February 27, 1979 dividend was a payment of 1978 profits from Snap-on Tools, Ltd., distributed in the first 60 days of 1979. Moreover, the plaintiff and the defendant generally agree that, in the past, dividends paid in the first 60 days of any year have been treated as distributed from the previous year's accumulated profits. At a minimum, under either the plaintiff's or the defendant's interpretation, an affirmative showing would have to be made to the Secretary of the Treasury, or to his delegated representative, the District Director, to prove that the dividend in question was not paid from the previous year's accumulated profits. To meet the statutory test, "unless to his satisfaction shown otherwise," or the very similar regulatory test, "unless it is otherwise established to his satisfaction," the 60–day rule should be available to the plaintiff in its calculations of taxes owed. In the instant case, given the parties' stipulation regarding the February 27, 1979 date upon which the dividend was distributed, such a showing cannot be made.

### CONCLUSION

For the reasons stated above, the court, hereby, GRANTS the plaintiff's Motion for Partial Summary Judgment for refund of federal income taxes wrongfully assessed and collected. The defendant's Cross–Motion for Summary Judgment is, therefore, DENIED. The court, by separate Order, will schedule a status conference at which time the parties should be prepared to discuss the amount of damages due the plaintiff. Prior to the status conference, counsel for the parties should consult with each other in an effort to enter into a stipulation regarding damages in accordance with this Opinion.

IT IS SO ORDERED.